# MINNESOTA LIFE

**GROUP UNIVERSAL LIFE
INSURANCE POLICY**

Minnesota Life Insurance Company  •  400 Robert Street North  •  St. Paul, Minnesota 55101-2098

## Read Your Policy Carefully

This policy was issued to the policyholder on the effective date shown on the policy specifications page. We promise to pay the benefits provided by this policy, subject to its conditions, limitations, and exceptions. We make this promise and issue this policy in consideration of the application for this policy and the payment of premium.

Minnesota Life Insurance Company is a subsidiary of Minnesota Mutual Companies, Inc., a mutual insurance holding company. The policyholder is a member of Minnesota Mutual Companies, Inc., which holds its annual meetings on the first Tuesday in March of each year at 3 p.m. local time. The meetings are held at 400 Robert Street North, St. Paul, Minnesota 55101-2098.

Signed for Minnesota Life Insurance Company at St. Paul, Minnesota on the effective date.

*Dennis E. Prokopowsky*

Secretary

*Robert L. Senkler*

President

## TABLE OF CONTENTS

Definitions.......................................................... 2
General Information ........................................... 3
Death Benefit...................................................... 5
Premium.............................................................. 6
Account Value and Net Cash Value................... 7
Loans.................................................................. 7
Withdrawals and Surrender............................... 8

Reports ............................................................... 9
Paid-Up Insurance Option ................................. 9
Portability............................................................ 9
Termination......................................................... 10
Conversion Right ............................................... 10
Additional Information......................................... 11

**GROUP UNIVERSAL LIFE INSURANCE POLICY • NONPARTICIPATING**

00-30252.12



Minnesota Life 1
Ed. F. 61213 6-2004

**MINNESOTA LIFE**                                          **GUL POLICY SPECIFICATIONS PAGE**

Minnesota Life Insurance Company  •  400 Robert Street North  •  St. Paul, Minnesota 55101-2098

## General Information

| | |
|---|---|
| **POLICYHOLDER:** | Katten Muchin Zavis Rosenman   **POLICY NO.:**   50173-G |
| **ASSOCIATED COMPANIES:** | All subsidiaries and affiliates reported to Minnesota Life by the policyholder for inclusion in the policy. |
| **POLICY EFFECTIVE DATE:** | June 1, 2004 |
| **POLICY ANNIVERSARY:** | June 1 of each year beginning June 1, 2005. |
| **ELIGIBLE GROUP:** | The eligible group is composed of all active employees and those with portability status. |
| **RETIREES:** | Retirees are not eligible to become insured under the group policy, but an insured employee who subsequently retires may be eligible to continue insurance under the portability provisions of the group policy. |
| **WAITING PERIOD:** | N/A |
| **MINIMUM HOURS PER WEEK REQUIREMENT:** | 20 hours per week |
| **ADMINISTRATION FEE:** | For primary insureds with non-portability status:  $0.00 |
| | For primary insureds with portability status:  $0.00 |
| **PERCENTAGE-OF-PREMIUM CHARGE:** | 3% |
| | Applies only to the portion of premium received for a primary insured that exceeds the monthly deduction. |
| **DEATH BENEFIT OPTION:** | Option B:  Increasing Death Benefit |

## Plan of Insurance

### EMPLOYEE BENEFIT SCHEDULE

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (GUL INSURANCE) ▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

| **Eligible Class** | **Face Amount of Insurance** |
|---|---|
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | |
| Class 2: North Carolina Partners | $   500,000* |
| Class 3: Of Counsel | An existing amount of insurance as reported to Minnesota Life by the employer, not to exceed $1,250,000. |

*Partners age 62 or older may elect to opt out of the program or reduce their amount of insurance.

**Supplemental Insurance**

| **Eligible Class** | **Face Amount of Insurance** |
|---|---|
| Class 1: Partners | An employee may choose an amount of supplemental insurance in increments of $100,000, subject to a maximum benefit of $2,000,000 (combined basic and supplemental insurance). |

F. 55538                                          A

Class 2: North Carolina Partners   An employee may choose an amount of supplemental insurance in increments of $100,000, subject to a maximum benefit of $2,000,000 (combined basic and supplemental insurance).

## General Provisions For Employee Insurance

**NONCONTRIBUTORY/CONTRIBUTORY:** Basic employee insurance is noncontributory insurance; supplemental insurance is contributory insurance.

~~GUARANTEED ISSUE AMOUNT:~~   ~~All basic insurance is guaranteed issue. All supplemental insurance~~ is subject to satisfactory evidence of insurability.

**EFFECTIVE DATE OF INCREASES AND DECREASES DUE TO A CHANGE IN ELIGIBLE CLASS OR EARNINGS:** N/A

**RATE GUARANTEE:** Rates are guaranteed until June 1, 2007. However, we reserve the right to adjust rates if volume changes per occurrence by 25% or more or other aspects of group composition changes.

## Riders to the Group Policy

Accelerated Benefits

# Definitions

**account value**

Net premiums paid for a certificate, plus interest earned and experience credits allocated to the account value, minus monthly deductions, withdrawals and any fees charged for such withdrawals.

**age**

Attained age as of most recent birthday.

**associated company**

Any company which is a subsidiary or affiliate of the policyholder and which is designated by the policyholder and agreed to by us to participate under this policy.

**certificate effective date**

The first day of the calendar month coinciding with or next following the date an owner's insurance under this policy becomes effective.  This is the date from which we determine certificate months and certificate years.

**certificate month**

A calendar month in which insurance is provided by a certificate issued under this policy.

**certificate specifications page**

The form which identifies the face amount of insurance and other insurance information for a primary insured.  The certificate specifications page is attached to and made a part of the owner's certificate.

**certificate year**

A period of twelve consecutive months during which insurance is provided by a certificate issued under this policy.  The first certificate year begins on the certificate effective date.

**contributory insurance**

Insurance for which an owner is required to pay premium.

**earnings**

An employee's basic rate of compensation not including commissions, overtime, premium pay, bonuses, or any other additional compensation.

**employee**

An individual who is employed by the policyholder or by an associated company.  A sole proprietor will be considered the employee of the proprietorship.  A partner in a partnership will be considered an employee as long as the partner's principal work is the conduct of the partnership's business.  The term employee does not include temporary employees, seasonal employees, nor corporate directors who are not otherwise employees.

**employer**

The policyholder or any associated company.

**evidence of insurability**

Evidence of the good health of a prospective insured and any other underwriting information we require.

**insured**

A person who is eligible for and becomes insured under the terms of this policy.

**loan principal**

The sum of all outstanding loans and the accumulated loan interest charges for a certificate.

**monthly deduction**

The sum of the cost of insurance, the cost of any additional insurance benefits provided by rider, and any administration fee for a certificate month.

**monthly deduction date**

The date in each certificate month on which we deduct the monthly deduction from an owner's account value.  The monthly deduction date is shown on the owner's certificate specifications page.

**net cash value**

The account value of a certificate increased by any accrued loan interest credits and reduced by any loan principal, accrued loan interest charges and any overdue monthly deductions.  It is the amount an owner may obtain through surrender of the certificate or apply toward the purchase of a paid-up whole life insurance policy.

**net premium**

The premium paid reduced by any percentage-of-premium charge.  The percentage-of-premium charge is shown on the policy specifications page.  It applies only to the portion of the premium paid that exceeds the amount of the monthly deduction.

**non-work day**

A day on which an employee is not regularly scheduled to work, including scheduled time off for vacations, personal holidays, weekends, holidays, and approved leaves of absence for non-medical reasons.

Non-work day does not include time off for medical leave of absence, temporary layoff, employer suspension of operations in total or in part, strike, or any time off due to sickness or injury including sick days, short-term disability, or long-term disability.

Minnesota Life 2
Ed. F. 61213 6-2004

**noncontributory insurance**

Insurance for which an owner is not required to pay premium.

**owner**

The owner of a certificate issued under this policy. Unless assigned otherwise, the primary insured is the owner of the certificate. Only the owner has the right to exercise ownership rights under the certificate, including but not limited to naming or changing a beneficiary, changing the face amount of insurance, requesting loans and withdrawals, surrendering the certificate, and assigning any or all ownership rights.

**policy anniversary**

The policy anniversary date shown on the policy specifications page.

**policy effective date**

The date this policy becomes effective, as shown on the policy specifications page.

**policy specifications page**

The form which summarizes the plan of insurance provided under this policy. The policy specifications page is attached to and made a part of this policy.

**policyholder**

The owner of this policy, as shown on the policy specifications page.

**primary insured**

An insured employee.

**successor plan**

An insurance policy or policies or an annuity contract or contracts provided by us or another insurer that replaces insurance provided under this policy.

**waiting period**

The period, if any, of continuous employment with the employer that the employee must satisfy prior to becoming eligible for insurance under this policy. The employer determines the waiting period based on the employer's practices and procedures. The waiting period is shown on the policy specifications page.

**we, our, us**

Minnesota Life Insurance Company.

**you, your**

The policyholder shown on the policy specifications page.

# General Information

**What is your agreement with us?**

This policy and your attached signed application contain the entire contract between you and us. Any statements you make will be considered representations and not warranties. Also, any statement that you make will not be used to void this policy, nor will it be used in our defense if we refuse to pay a claim, unless the statement is contained in your application a copy of which has been furnished to you.

No change or waiver of any provision of this policy, or any certificate issued under it, will be valid unless made in writing by us and signed by our president, a vice-president, our secretary, or an assistant secretary. No agent or other person has the authority to change or waive any provision of this policy, nor of any certificate issued under it.

In making any benefits determination under this policy, we shall have the discretionary authority both to determine an individual's eligibility for benefits and to construe the terms of this policy.

**Are employees of associated companies eligible for insurance under this policy?**

Employees of associated companies may be eligible for insurance under this policy. Associated companies are shown on the policy specifications page. You represent any associated company in all transactions pertaining to this policy. Your acts or omissions and every notice given by us to you shall be binding on every associated company.

**Can this policy be amended?**

Yes. Neither the owners' nor insureds' consent is required to amend this policy or any certificate issued under it. Any amendment will be without prejudice to any claim for benefits incurred prior to the effective date of the amendment.

**Which employees are eligible for insurance?**

An employee is eligible for insurance if he or she:

(1) is a member of the eligible group and of an eligible class shown on the policy specifications page; and
(2) has satisfied any waiting period shown on the policy specifications page; and
(3) meets the actively-at-work requirement described in the "What is the actively-at-work requirement?" provision of this section.

**Are retired employees eligible for insurance?**

The policy specifications page indicates whether or not retired employees are eligible to become insured under this policy. If retired employees are eligible, the actively-at-work requirement will not apply to them. Regardless of

initial eligibility for retirees, insurance on an insured employee who subsequently retires may still be eligible to be continued under the portability provisions of this policy.

**What is the actively-at-work requirement?**

To be eligible to become insured or to receive an increase in the face amount of insurance, an employee must be actively at work for the required minimum hours per week shown on the policy specifications page, performing his or her customary duties at the employer's normal place of business or at other places the employer's business requires him or her to travel.

Employees not working due to illness or injury do not meet the actively-at-work requirement, nor do employees receiving sick pay, short-term disability benefits, long-term disability benefits, or any other compensation due to illness or injury.

If an employee is not actively at work on the date insurance would otherwise begin, or on the date an increase in the face amount of insurance would otherwise be effective, the employee will not be eligible for the insurance or increase until he or she returns to active work. However, if the absence is on a non-work day, insurance will not be delayed provided the employee was actively at work on the work day immediately preceding the non-work day.

Except as otherwise provided for in this policy, an employee is eligible to continue to be insured only while he or she remains actively at work.

**When will we require evidence of insurability?**

Evidence of insurability will be required if:

(1) the amount of insurance applied for is greater than the guaranteed issue amount shown on the policy specifications page; or

(2) the insurance is contributory and application for the prospective insured is not made within 31 days from the date he or she is first eligible for insurance; or

(3) the insurance is noncontributory and the prospective insured does not become insured, due to nonpayment of premium, within the three-month period beginning on the date he or she is first eligible for insurance. This will not apply if it is shown that the nonpayment of premium was due to clerical error only, in which case premium will be due retroactive to the date the prospective insured was first eligible for insurance; or

(4) insurance for which the prospective insured was previously enrolled did not go into effect or was terminated because the owner failed to make a required premium payment; or

(5) during a previous period of eligibility, the prospective insured failed to submit evidence of insurability or that which was submitted was not satisfactory to us; or

(6) the prospective insured is insured by an individual policy issued under the conversion provisions of this policy.

**What is guaranteed issue insurance?**

Guaranteed issue insurance is insurance that can be obtained for a prospective insured without providing evidence of insurability. To be eligible for guaranteed issue insurance, a prospective insured must meet all eligibility requirements and, for contributory insurance, application must be made within 31 days from the date the prospective insured is first eligible for insurance. The guarantee issue amounts are shown on the policy specifications page.

**When does insurance become effective?**

Insurance becomes effective on the date that all of the following conditions have been met:

(1) a prospective insured meets all eligibility requirements; and

(2) if required, the owner applies for the insurance on forms which are approved by us; and

(3) we are satisfied with the prospective insured's evidence of insurability, if we require evidence; and

(4) we receive the required premium.

**Can insurance be continued during an insured employee's sickness, injury, leave of absence or temporary layoff?**

Yes. Subject to the employer's practices and procedures, insurance may be continued when an insured employee is not actively at work due to sickness, injury, leave of absence or temporary layoff. Insurance will continue until terminated in accordance with the termination provisions of this policy or, if earlier, based on the employer's practices and procedures; however, in no event will it continue beyond the following time frames:

(1) Insurance continued for non-medical leave of absence or temporary layoff may be continued for up to twelve months from the last day the insured employee was actively at work.

(2) Insurance continued for sickness, injury or medical leave of absence may be continued until the earlier of the insured's retirement date or attainment of age 65.

Continuation of insurance must be in accordance with practices and procedures that preclude individual selection.

Continuation provided under this provision does not affect the rights of continuation under the portability provisions of this policy. An individual continuing insurance under this provision is continuing with non-portability status.

Minnesota Life 4
Ed. F. 61213 6-2004

# Death Benefit

## What is the amount of the death benefit?

The amount of the death benefit depends on whether Option A or Option B is in effect for a certificate. Option A is a level death benefit. Option B is an increasing death benefit. The death benefit option for all certificates issued under this policy will be the death benefit option selected by you. The death benefit option is shown on the policy specifications page.

## Option A - Level Death Benefit

The amount of the death benefit for Option A is:

(1) the greater of the face amount of insurance on the date of death or the minimum death benefit on the date of death; plus

(2) any premium received after the date of death; minus

(3) any unpaid monthly deductions due through the month in which death occurs, and any loan principal and accrued loan interest charges

## Option B – Increasing Death Benefit

The amount of the death benefit for Option B is:

(1) the greater of the face amount of insurance plus the account value on the date of death, or the minimum death benefit on the date of death; plus

(2) any monthly deductions deducted from the account value for months subsequent to the month in which death occurs, and any accrued loan interest credits; minus

(3) any unpaid monthly deductions due through the month in which death occurs, and any loan principal and accrued loan interest charges.

We intend for each certificate under this policy to qualify as a life insurance policy as defined by Section 7702 of the Internal Revenue Code. We reserve the right to increase the face amount of insurance or limit the amount of premium we will accept in order to maintain such qualification.

## What is the minimum death benefit?

The minimum death benefit is an amount determined by us that is required to preserve the qualification of the certificate as a life insurance policy as defined by Section 7702 of the Internal Revenue Code. The minimum death benefit is a percentage of the account value. The percentage depends on the age and nicotine status of the primary insured as identified in Table B. We reserve the right to change this table.

## Can the owner change the death benefit option?

No.

## What is the face amount of insurance?

The available face amounts of insurance are shown on the policy specifications page. The specific face amount on a primary insured is shown on the owner's certificate specifications page.

## How can the face amount of insurance change?

An owner can request an increase or a decrease in the face amount of his or her contributory insurance within the limitations of the plan of insurance, including any limitations on when and how often such requests may be made. All requests must be made in writing or through any other method made available by us under this policy.

If an owner requests an increase in the face amount of his or her contributory insurance, we will require satisfactory evidence of insurability. If a decrease in the face amount of contributory insurance is requested, the remaining face amount of insurance cannot be less than $10,000.

The face amount of insurance may increase or decrease as a result of a change in the primary insured's eligible class, earnings or age as determined by the plan of insurance. If a change in earnings results in a face amount of insurance over the guaranteed issue amount, the amount of insurance that exceeds the guaranteed issue amount will require satisfactory evidence of insurability.

For an Option A death benefit, a withdrawal will reduce the face amount of insurance by the amount of the withdrawal and the withdrawal fee.

## When will changes in the face amount of insurance be effective?

Requested increases in the face amount of insurance, if approved, are effective on the date we approve the increase. Requested decreases in the face amount are effective on the first day of the month following our receipt of the request for a decrease, or the date requested by the owner if later.

Increases and decreases in insurance amounts which result from a change in the primary insured's eligible class, earnings or age will be effective as shown on the policy specifications page.

Changes in the face amount of insurance due to a withdrawal will be effective on the date of the withdrawal.

All increases in the face amount of insurance for an employee, other than an increase due to a change in death benefit option, are subject to the actively-at-work requirement.

## When will the death benefit be payable?

We will pay the death benefit upon receipt at our home office of written proof satisfactory to us that an individual died while insured under this policy. All payments by us are payable from our home office.

Minnesota Life 5
Ed. F. 61213 6-2004

The death benefit will be paid in a single sum or by any other method agreeable to us and the beneficiary. We will pay interest on the face amount of insurance from the date of the insured's death until the date of payment. Interest will be at an annual rate determined by us, but never less than 3% per year or the minimum required by state law, whichever is greater.

**To whom will we pay the death benefit?**

We will pay the death benefit to the beneficiary or beneficiaries. A beneficiary is named by an owner to receive the death benefit to be paid at the insured's death. The owner may name one or more beneficiaries. The owner may choose to name an irrevocable beneficiary which means that the owner cannot change this beneficiary without his or her consent. The owner cannot name you or an associated company as a beneficiary.

If there is more than one beneficiary, each will receive an equal share of the death benefit, unless the owner has requested another method in writing. To receive payment, a beneficiary must be living at the time of the insured's death. In the event a beneficiary is not living at the time of the insured's death, that beneficiary's portion of the death benefit will be equally distributed to the remaining surviving beneficiaries. In the event of the simultaneous deaths of the insured and a beneficiary, the death benefit will be paid as if the insured survived the beneficiary.

If there is no eligible beneficiary, or if the owner does not name one, we will pay the death benefit to:

(1) the primary insured's lawful spouse, if living; otherwise
(2) the primary insured's natural or legally adopted children in equal shares, if living; otherwise
(3) the primary insured's parents in equal shares, if living; otherwise
(4) the personal representative of the primary insured's estate.

**Can an owner add or change beneficiaries?**

Yes. An owner can add or change beneficiaries if the insurance is in force and we have written consent of any affected irrevocable beneficiaries.

A request to add or change a beneficiary must be made in writing or through any other method made available by us under this policy. All requests are subject to our approval. A change will take effect as of the date it is signed, but will not be effective as to any payment we have made or actions we have taken before receiving an owner's request.

# Premium

**When and how often is premium due?**

A premium must be paid to put a certificate issued under this policy in force. This initial premium must cover the first monthly deduction. A premium must also be paid when there is insufficient net cash value to pay the

monthly deduction necessary to keep the certificate in force.

The monthly deduction is the sum of the following for a certificate month:

(1) the cost of insurance; and
(2) the cost of any additional insurance benefits provided by rider; and
(3) any administration fee.

The administration fee, if any, is shown on the policy specifications page. We reserve the right to change the administration fee, not to exceed the guaranteed maximum administration fee of $4.00.

**Can additional premium be paid to accumulate cash value?**

Yes. Additional premium can be paid which exceeds the amount required to pay the monthly deduction. A percentage-of-premium charge will be deducted from the additional premium. The remainder will be credited to the owner's account value to accumulate at interest. The percentage-of-premium charge is shown on the policy specifications page. We reserve the right to change this charge, not to exceed the guaranteed maximum percentage-of-premium charge of 5%.

We reserve the right to limit the amount of additional premium to maintain a certificate's qualification as a life insurance policy as defined by Section 7702 of the Internal Revenue Code.

**What are scheduled premium payments?**

Scheduled premium payments are periodic premium payments set and paid by the owner. The scheduled premium payment amount will be shown on the owner's certificate specifications page. The owner can change the amount and frequency of scheduled premium payments. The owner may also choose not to make a scheduled premium payment. Failure to make one or more scheduled premium payments will not cause the insurance to terminate until such time as the net cash value is insufficient to pay the monthly deduction necessary to keep the insurance in force. For noncontributory insurance, you make scheduled premium payments, although the owner may also make scheduled premium payments for such insurance.

**What are lump sum premium payments?**

In addition to scheduled premium payments, an owner or policyholder may make lump sum premium payments. Lump sum premium payments are non-repeating premium payments. The minimum amount of a lump sum premium payment is $100.

We reserve the right to limit any lump sum premium payment to less than the amount which, when added to the owner's account value, equals the single premium for a paid-up whole life policy for the insured's death benefit. We also reserve the right to limit a lump sum premium

payment to maintain a certificate's qualification as a life insurance policy as defined by Section 7702 of the Internal Revenue Code.

**Is there continuation of insurance upon discontinuation of premium payments?**

Yes. Provided the net cash value of the certificate is sufficient to pay the monthly deductions necessary to keep the insurance in force, insurance shall continue upon discontinuation of premium payments. When the net cash value no longer is sufficient to pay the due monthly deduction, the grace period will begin unless premium payments are resumed.

**Is there a grace period for the payment of premium?**

Yes. Certificates issued under this policy have a 31-day grace period. The grace period will start on the monthly deduction date on which the net cash value of the certificate is insufficient to cover the monthly deduction necessary to keep the insurance in force. The insurance will lapse if the premium amount necessary to cover the monthly deduction due is not received by us by the end of the grace period. Lapse means all insurance provided by the certificate terminates. Insurance will remain in effect during the 31-day grace period. The grace period does not apply to the first premium payment.

**How do we determine the cost of insurance?**

The cost of insurance on the life of a primary insured for a certificate month is equal to a risk factor multiplied by the net amount at risk for the certificate. The risk factor is based on the primary insured's age and rate class. The risk factor is subject to change, but will never exceed the maximums shown in Table A. The calculation of the net amount at risk depends on the death benefit option in effect for a certificate as follows:

**Option A - Level Death Benefit**

The net amount at risk is equal to:

    (1)  the greater of the face amount of insurance or the minimum death benefit; minus
    (2)  the account value immediately prior to the deduction of the cost of insurance.

**Option B - Increasing Death Benefit**

The net amount at risk is equal to the greater of:

    (1)  the face amount of insurance; or
    (2)  the minimum death benefit minus the account value immediately prior to the deduction of the cost of insurance.

## Account Value and Net Cash Value

**What is the account value of a certificate?**

On the certificate effective date we will open an account for the owner to which we will add any net premium we

receive for that certificate on or before the certificate effective date. This amount is the owner's beginning account value for the first certificate month. After the first certificate month, the beginning account value for a certificate month is equal to the ending account value from the previous certificate month.

On the monthly deduction date, we deduct from the account value the administration fee, if any, shown on the policy specifications page. We also deduct the cost of insurance on the life of the primary insured as well as the cost for any additional benefits provided by rider.

During the certificate month, we add to the account value any net premium we receive for that certificate. We subtract from the account value the amount of any withdrawals and fees charged for such withdrawals.

During the certificate month, interest is credited on the account value at a rate not less than 3% per year compounded annually. We may pay less interest on the loan principal portion of the account value than on the remainder of the account value, but in no event will we pay less than 3% interest.

The result is the owner's ending account value for the certificate month.

**What is the net cash value of a certificate?**

The net cash value is the amount of money we will pay if the owner elects to surrender the certificate or the amount the owner may apply toward the purchase of a paid-up whole life insurance policy.

The net cash value is equal to the account value, plus accrued loan interest credits, minus any loan principal, accrued loan interest charges and any overdue monthly deductions.

**Will an owner have access to the net cash value?**

Yes. The owner will have access to the net cash value through loans, withdrawals or a surrender of his or her certificate.

## Loans

**Can an owner borrow against the net cash value of his or her certificate?**

Yes. An owner can request a loan from the net cash value at any time. A request for a loan may be made in writing or through any other method made available by us under this policy.

We reserve the right to postpone payment of a loan for up to six months.

**What are the minimum and maximum loan amounts available?**

The amount of a loan must be at least $100 and cannot exceed (a) minus (b), where (a) is 90 percent of the

account value and (b) is any loan principal plus accrued loan interest charges.

**What is the effect of a loan?**

When a loan is taken, we will reduce the net cash value of the certificate by the amount borrowed. The amount borrowed becomes loan principal and is added to any existing loan principal.

**What is the loan principal?**

The loan principal is the sum of all outstanding loans and accumulated loan interest charges for the certificate. The loan principal accrues loan interest credits and loan interest charges and continues to be part of the account value.

**What is the interest rate charged on the loan principal?**

The interest rate charged on the loan principal is 8% per year. If accrued loan interest charges are not paid at the end of a certificate month, this interest will be deducted from the net cash value, added to the loan principal and charged the same rate of interest as the loan principal in effect.

**What is the interest rate credited to a certificate as a result of a loan?**

Interest will be credited on the loan principal at a rate which is not less than 6% per year and will be added to the net cash value.

**When and in what amount should loan repayments be made?**

The loan principal and accrued loan interest charges may be repaid in full or in part at any time before the primary insured's death provided that the insurance under the certificate is in force. The loan principal and accrued loan interest charges may also be repaid within 60 days after the date of the primary insured's death if we have not yet paid any of the death benefit. The amount of any loan repayment must be at least $100 unless the balance due is less than $100.

**How do loan repayments affect the loan principal and net cash value?**

Loan repayments reduce the amount of the loan principal by the amount of the loan repayment, therefore increasing the net cash value of a certificate.

**What happens if a loan is not repaid?**

If a loan is not repaid, the loan principal will continue to increase, reducing the certificate's net cash value. The certificate will remain in force provided that the net cash value is sufficient to pay the monthly deduction necessary to keep the certificate in force. If the certificate does not have sufficient net cash value, the insurance will lapse if the premium necessary to cover the monthly deduction due is not received by us by the end of the grace period.

Lapse means all insurance provided by the certificate terminates. Insurance will remain in effect during the 31-day grace period.

## Withdrawals and Surrender

**Can an owner request a withdrawal from the certificate's net cash value?**

Yes. An owner can request a withdrawal from the net cash value at any time. A request for a withdrawal may be made in writing or through any other method made available by us under this policy.

A fee of not more than $15 will be charged for each withdrawal.

**What are the minimum and maximum withdrawal amounts available?**

The amount of a withdrawal must be at least $100 and cannot exceed (a) minus (b), where (a) is 100 percent of the account value and (b) is any loan principal and accrued loan interest charges.

We reserve the right to change the minimum amount or limit the number of times the owner may make a withdrawal.

**What is the effect of a withdrawal on a certificate?**

A withdrawal reduces the net cash value of a certificate by the amount of the withdrawal and the withdrawal fee.

For an Option A death benefit, a withdrawal will also reduce the face amount of insurance by the amount of the withdrawal and the withdrawal fee, therefore reducing the death benefit by the same amount.

For an Option B death benefit, a withdrawal will not change the face amount of insurance. However, since the account value is reduced by the amount of the withdrawal and the withdrawal fee, the death benefit under Option B will be reduced by this same amount.

**Can an owner surrender his or her certificate?**

Yes. An owner can surrender his or her certificate at any time. Surrendering the certificate means that the insurance under the certificate is terminated and we pay the net cash value to the owner. A request for a surrender may be made in writing or through any other method made available by us under this policy.

The net cash value will be calculated as of the date we process the owner's request.

**Can we postpone payment of a withdrawal or surrender?**

Yes. We reserve the right to postpone the payment of any withdrawal or surrender for up to six months.

## Reports

### Will an owner receive a quarterly report?

A quarterly report showing the status of the certificate will be provided to each owner whose ending account value for the report period is greater than zero. This insurance review will include:

(1) the total of all premiums paid and loan repayments made; and
(2) the monthly deductions taken from the account value; and
(3) the interest credited; and
(4) the amount of any withdrawals; and
(5) the amount of any loan principal; and
(6) the net cash value; and
(7) the current death benefit; and
(8) the beginning and ending account values.

### Can an owner request an illustration of his or her projected future account values?

Yes. Upon request, we will provide an owner with an illustration of his or her projected future account values. The projection will be based on:

(1) the owner's face amount of insurance; and
(2) the owner's scheduled premium payments; and
(3) any other necessary assumptions specified by the owner or us.

A fee of not more than $20 will be charged for an illustration.

## Paid-Up Insurance Option

### What is the paid-up insurance option?

An owner can request at any time that his or her certificate be changed to an individual policy of paid-up whole life insurance. If such a request is made, we will terminate the group insurance on the primary insured provided under this policy and we will issue a new individual paid-up policy.

The death benefit provided by the paid-up policy will be determined as follows:

(1) We will calculate the net cash value of the certificate on the date of the change. This will be the initial cash value of the paid-up policy.
(2) The amount of the paid-up death benefit will be determined by multiplying the net cash value by a paid-up insurance factor. The minimum paid-up insurance factors are shown in Table C.

In no event will we be liable under both this policy and the new individual policy.

## Portability

### Can insurance be continued under this policy for a primary insured who loses eligibility?

Yes. Insurance under this policy may be continued for a primary insured who no longer meets the eligibility requirements of this policy, provided the loss of eligibility is not due to an amendment to this policy, or is due to an amendment and there is no successor plan.

If this condition is met, the primary insured will then be considered to have portability status and the date of the change in status will be considered his or her portability date.

Insurance for a primary insured who has portability status is automatically continued. We will bill the owner and all premium payments on and after the portability date will be paid directly to us. The monthly deduction may be higher than that for primary insureds who do not have portability status. The monthly deduction may increase in the future, but will not exceed the maximums identified in the "Premium" section.

Continuance of insurance under these portability provisions includes any additional insurance benefits provided by rider.

### Can a primary insured acquire portability status if this policy terminates?

If this policy terminates and there is a successor plan, a primary insured who does not already have portability status cannot acquire portability status. Insurance will terminate for such a primary insured. If this policy terminates and there is not a successor plan, a primary insured can acquire portability status.

### What are the minimum and maximum face amounts of insurance that can be continued?

The minimum face amount of insurance that can be continued for a primary insured is $10,000. The maximum face amount of insurance that can be continued for a primary insured on his or her portability date is the face amount of insurance in effect on the primary insured's portability date.

### Can an owner request a change in the face amount of insurance for a primary insured with portability status?

Yes. An owner can request a change in the face amount of insurance to any increment of $1,000, subject to a minimum amount of $10,000 and a maximum amount equal to the maximum amount available to active participants of the insured's class.

Requests for changes in the face amount of insurance may be made in writing or through any other method made available by us under this policy. If an owner requests an increase in the face amount of insurance, we

will require satisfactory evidence of insurability. The increase, if approved, will be effective on the date of our approval. The actively-at-work requirement will not apply to any such increase. Requested decreases in the face amount will be effective on the first day of the month following our receipt of the request for a decrease, or the date requested by the owner if later.

**Can an owner apply for any additional insurance benefits provided by rider while the primary insured has portability status?**

No. No certificate supplements may be added to an owner's certificate while the primary insured has portability status.

**What happens if a primary insured with portability status again meets all of the eligibility requirements of this policy?**

If a primary insured with portability status again meets the eligibility requirements of this policy, he or she will no longer be considered to have portability status. Insurance for that primary insured may be provided only under the terms of this policy that apply to those with non-portability status. The face amount of insurance will not be reduced solely due to a change to non-portability status. A primary insured cannot be insured under this policy with both portability status and non-portability status.

**What happens to insurance being continued under the portability provisions if this policy terminates?**

Notwithstanding anything in this policy to the contrary, termination of this policy will not terminate insurance then in force on a primary insured with portability status. This policy will be deemed to remain in force solely for the purpose of continuing such insurance, but without further obligation of the policyholder.

## Termination

**When does insurance on a primary insured terminate?**

Insurance on a primary insured terminates on the earliest of:

(1) 31 days after the monthly deduction date on which the net cash value is insufficient to cover the monthly deduction, if at that time the net cash value of the certificate remains insufficient to pay the monthly deduction; or
(2) the date we process the owner's request to surrender the certificate or terminate the insurance; or
(3) the primary insured's 100th birthday; or
(4) the date the primary insured no longer meets the eligibility requirements of this policy, unless the insurance can be continued under the portability provisions; or
(5) the date this policy is amended to terminate insurance for a primary insured, unless the insurance can be continued under the portability provisions; or

(6) the date this policy terminates, unless the insurance can be continued under the portability provisions.

**Can insurance on the life of a primary insured be reinstated after lapse?**

Yes. Insurance terminated because the net cash value is insufficient to pay for the monthly deduction may be reinstated. Reinstatement must occur while the primary insured is living and within three years from the date of lapse. Reinstatement is made by our receipt of a premium payment in an amount that is large enough to cover all monthly deductions which have accrued on the certificate up to the effective date of reinstatement plus the monthly deductions for the two months following the effective date of reinstatement. If any loan principal and accrued loan interest charges are not repaid, this indebtedness will be reinstated along with the insurance. No evidence of the primary insured's insurability will be required for reinstatement during the first 31 days following lapse, but satisfactory evidence of insurability will be required from the 32nd day to three years from the date of the lapse.

The face amount of any noncontributory insurance will be that which applies to the class to which the primary insured belongs on the date of reinstatement. The face amount of contributory insurance will be that for which the primary insured was insured immediately prior to lapse.

**When does this policy terminate?**

You may terminate this policy by giving us 31 days prior written notice.

We reserve the right to terminate this policy 61 days after we provide you with notice of our intent to terminate this policy.

**Can this policy be reinstated?**

No. We will not reinstate this policy after it terminates. You must submit an application for a new policy after this policy has terminated.

**What happens to account values if this policy terminates?**

If this policy terminates, we reserve the right to complete the distribution of account values over a period of time determined by us, but not more than five years. This delayed distribution does not in any way continue or extend any insurance that has otherwise terminated.

## Conversion Right

**What is the conversion right?**

An owner may be able to convert the life insurance provided by his or her certificate to a new individual insurance policy if all or part of the owner's life insurance under this policy terminates. Conversion is not available if the certificate has lapsed due to failure to make a required premium payment.

Minnesota Life 10
Ed. F. 61213 6-2004

The owner can convert up to the full amount of terminated life insurance if termination occurs because the insured no longer meets the eligibility requirements of this policy and the owner is not eligible to continue the insurance under the portability provisions.

Limited conversion is available if insurance is terminated because this policy is terminated or amended to reduce or terminate the insurance for an insured, the insured has been insured for at least five years, and the owner is not eligible to continue the insurance under the portability provisions. For limited conversion, the owner may convert up to the full amount of terminated insurance, but not more than the maximum. The maximum is the lesser of:

(1) $10,000; or
(2) the amount of life insurance which terminated minus any amount of group life insurance for which the insured becomes eligible under any group policy issued or reinstated within 31 days of the date the insurance terminated under this policy.

**To what type of policy may an owner convert his or her insurance?**

The owner may convert his or her insurance to any type of individual policy of life insurance then customarily issued by us for purposes of conversion, except term insurance. The individual policy will not include any supplemental benefits, including, but not limited to, any disability benefits or accidental death and dismemberment benefits.

**How does an owner convert his or her insurance?**

An owner converts his or her insurance by applying for an individual policy and paying the first premium. The owner's application and the first premium payment must be received by us within 31 days after the group insurance terminates. No evidence of insurability will be required.

If the owner does not receive written notice of the conversion right under this policy at least 15 days prior to the end of the 31-day conversion period, he or she will have an additional period within which to exercise such right. This additional period will expire 15 days after the owner is given such notice, but in no event will such additional period be extended beyond 60 days after the end of the conversion period. Notice of the conversion right will be presented to the owner or sent to his or her last known address. Receipt of the owner's certificate will constitute such notice. Nothing contained herein will be construed to continue any insurance beyond the period provided in this policy.

**How is the premium for the individual policy determined?**

We base the premium for the individual policy on the plan of insurance, the insured's age, and the class of risk to which the insured belongs on the date of the conversion.

**When is the individual policy effective?**

The individual policy takes effect 31 days after the group insurance terminates or, if later, upon our receipt of the application if application is made during the additional period allowed for conversion.

**What happens if an insured dies during the 31-day conversion period?**

If an insured dies during the 31-day conversion period, we will pay a death benefit regardless of whether or not an application for insurance under an individual policy has been submitted. The death benefit will be the face amount of insurance the owner would have been eligible to convert under the terms of the conversion provisions. We will return any premium paid for an individual policy to the beneficiary named under this group policy. In no event will we be liable under both this group policy and the individual policy.

## Additional Information

**What if an insured's age has been misstated?**

If the age of an insured has been misstated, the face amount of insurance will be that amount to which the insured is entitled based on his or her correct age.

The death benefit and account value will be adjusted. The adjustment will be:

(1) the cost of insurance charges that were paid; minus
(2) the cost of insurance charges that should have been paid based on the insured's correct age.

This amount will be accumulated at interest. The interest rates that will be used are the rates that were used in accumulating the account value.

**Is there a suicide exclusion?**

Yes. A suicide exclusion applies to contributory insurance on the life of a primary insured. The suicide exclusion limits our liability to an amount equal to the premium paid for contributory insurance on the life of a primary insured if that primary insured, whether sane or insane, dies by suicide within two years of the effective date of the insurance.

If there has been an increase in the face amount of contributory insurance on the life of a primary insured for which application or evidence of insurability was required, and if the primary insured dies by suicide within two years of the effective date of the increase, our liability with respect to that increase will be limited to the cost of insurance paid and attributable to such increase.

If the primary insured is a Missouri citizen when the certificate becomes effective, the suicide exclusion does not apply on the certificate effective date, or on the effective date of any increase in the face amount of

insurance, unless the primary insured intended suicide when the certificate, or any increase, was applied for.

If the primary insured is a citizen of Colorado or North Dakota, the duration of this suicide exclusion is for one year instead of two years.

**When does insurance become incontestable?**

After insurance has been in force on an insured during his or her lifetime for two years from the effective date of such insurance, we cannot contest the insurance for any loss that is incurred more than two years from the effective date of such insurance, except if the insurance has lapsed. However, if there has been an increase in the face amount of insurance for which application or evidence of insurability was required, then, to the extent of the increase, any loss which occurs within two years of the effective date of the increase will be contestable.

Any statements an insured or owner makes in an application will be considered representations and not warranties. Also, any statement an insured or owner makes will not be used to void the insurance, nor defend against a claim, unless the statement is contained in the signed application, which is deemed a part of the owner's certificate, or any evidence of insurability application, and a copy containing the statement is furnished to the owner, the beneficiary, or the owner's or beneficiary's personal representative.

**Can a certificate be assigned?**

Yes. However, we will not be bound by an assignment of a certificate or of any interest in such certificate unless the assignment is made in writing or through any other method made available by us under this policy and we send the owner an acknowledgement of the assignment.

We are not responsible for the validity of any assignment. An owner is responsible for ensuring that the assignment is legal and that it accomplishes his or her intended goals. If a claim is based on an assignment, we may require proof of interest of the claimant. A valid assignment will take precedence over a claim of a beneficiary.

**Can a change of ownership for a certificate be requested?**

Yes. A change of ownership is a type of assignment. All provisions for assignments apply to ownership changes.

**Are you required to maintain records?**

Yes. You are required to maintain adequate records of any information necessary for us to administer this policy. We can obtain these records from you at any reasonable time.

If a clerical error is made in keeping records on the insurance under this policy, it will not affect otherwise valid insurance. A clerical error does not continue insurance which is otherwise terminated, nor put into effect insurance to which an owner is not otherwise entitled. If an error causes a change in premium payment, we will make a fair adjustment.

**Will a certificate of insurance be provided for each owner?**

Yes. The certificate will include information regarding the principal provisions of the insurance.

**Will this policy receive experience credits?**

Each year we will determine if this policy will receive an experience credit.

**Are you our agent?**

No. For all purposes of this policy, neither you, an associated company, nor any administrator you appoint is our agent. We will not be liable for any of your acts or omissions or those of an associated company or administrator.

**Will the provisions of this policy conform with state law?**

Yes. If any provision in this policy, or in the certificates issued under this policy, is in conflict with the laws of the state governing the policy or the certificates, the provision will be deemed to be amended to conform to such laws.

Minnesota Life 12
Ed. F. 61213 6-2004

## TABLE A

### MINNESOTA LIFE INSURANCE COMPANY

**Guaranteed Maximum Monthly Risk Factor
on a Nicotine-Distinct Basis
per $1,000 Net Amount at Risk**

| Attained Age | Maximum Monthly Risk Factor | | Attained Age | Maximum Monthly Risk Factor | | Attained Age | Maximum Monthly Risk Factor | |
|---|---|---|---|---|---|---|---|---|
| | Non-Nicotine | Nicotine | | Non-Nicotine | Nicotine | | Non-Nicotine | Nicotine |
| 10 | 0.076 | 0.076 | 40 | 0.243 | 0.406 | 70 | 3.427 | 5.191 |
| 11 | 0.082 | 0.082 | 41 | 0.261 | 0.445 | 71 | 3.797 | 5.648 |
| 12 | 0.091 | 0.091 | 42 | 0.281 | 0.488 | 72 | 4.230 | 6.171 |
| 13 | 0.104 | 0.104 | 43 | 0.302 | 0.534 | 73 | 4.724 | 6.757 |
| 14 | 0.118 | 0.118 | 44 | 0.324 | 0.584 | 74 | 5.273 | 7.405 |
| 15 | 0.129 | 0.163 | 45 | 0.350 | 0.636 | 75 | 5.864 | 8.100 |
| 16 | 0.139 | 0.179 | 46 | 0.377 | 0.691 | 76 | 6.491 | 8.815 |
| 17 | 0.147 | 0.192 | 47 | 0.407 | 0.749 | 77 | 7.149 | 9.540 |
| 18 | 0.152 | 0.202 | 48 | 0.439 | 0.813 | 78 | 7.845 | 10.278 |
| 19 | 0.156 | 0.208 | 49 | 0.474 | 0.882 | 79 | 8.600 | 11.058 |
| 20 | 0.158 | 0.212 | 50 | 0.514 | 0.958 | 80 | 9.439 | 11.904 |
| 21 | 0.157 | 0.212 | 51 | 0.559 | 1.043 | 81 | 10.384 | 12.841 |
| 22 | 0.154 | 0.210 | 52 | 0.611 | 1.140 | 82 | 11.456 | 13.886 |
| 23 | 0.152 | 0.208 | 53 | 0.671 | 1.249 | 83 | 12.649 | 15.034 |
| 24 | 0.149 | 0.204 | 54 | 0.736 | 1.367 | 84 | 13.943 | 16.241 |
| 25 | 0.146 | 0.199 | 55 | 0.808 | 1.492 | 85 | 15.311 | 17.473 |
| 26 | 0.144 | 0.197 | 56 | 0.885 | 1.624 | 86 | 16.737 | 18.705 |
| 27 | 0.143 | 0.197 | 57 | 0.967 | 1.760 | 87 | 18.205 | 19.973 |
| 28 | 0.143 | 0.198 | 58 | 1.056 | 1.903 | 88 | 19.710 | 21.295 |
| 29 | 0.144 | 0.202 | 59 | 1.156 | 2.056 | 89 | 21.271 | 22.625 |
| 30 | 0.146 | 0.208 | 60 | 1.268 | 2.228 | 90 | 22.908 | 24.006 |
| 31 | 0.149 | 0.215 | 61 | 1.395 | 2.424 | 91 | 24.659 | 25.457 |
| 32 | 0.153 | 0.223 | 62 | 1.544 | 2.650 | 92 | 26.588 | 27.118 |
| 33 | 0.159 | 0.235 | 63 | 1.714 | 2.904 | 93 | 28.870 | 29.192 |
| 34 | 0.166 | 0.249 | 64 | 1.903 | 3.184 | 94 | 31.894 | 32.006 |
| 35 | 0.174 | 0.265 | 65 | 2.110 | 3.480 | 95 | 36.370 | 36.370 |
| 36 | 0.184 | 0.285 | 66 | 2.332 | 3.788 | 96 | 43.668 | 43.668 |
| 37 | 0.197 | 0.310 | 67 | 2.568 | 4.104 | 97 | 56.256 | 56.256 |
| 38 | 0.210 | 0.338 | 68 | 2.823 | 4.434 | 98 | 77.589 | 77.589 |
| 39 | 0.225 | 0.369 | 69 | 3.105 | 4.792 | 99 | 83.333 | 83.333 |

## TABLE A

### MINNESOTA LIFE INSURANCE COMPANY

**Guaranteed Maximum Monthly Risk Factor
on a Uni-Nicotine Basis
per $1,000 Net Amount at Risk**

| Attained Age | Maximum Monthly Risk Factor Uni-Nicotine | Attained Age | Maximum Monthly Risk Factor Uni-Nicotine | Attained Age | Maximum Monthly Risk Factor Uni-Nicotine |
|---|---|---|---|---|---|
| 10 | 0.076 | 40 | 0.312 | 70 | 3.835 |
| 11 | 0.082 | 41 | 0.339 | 71 | 4.214 |
| 12 | 0.091 | 42 | 0.368 | 72 | 4.654 |
| 13 | 0.104 | 43 | 0.398 | 73 | 5.157 |
| 14 | 0.118 | 44 | 0.431 | 74 | 5.712 |
| 15 | 0.134 | 45 | 0.465 | 75 | 6.310 |
| 16 | 0.148 | 46 | 0.502 | 76 | 6.941 |
| 17 | 0.159 | 47 | 0.541 | 77 | 7.599 |
| 18 | 0.168 | 48 | 0.583 | 78 | 8.289 |
| 19 | 0.174 | 49 | 0.629 | 79 | 9.033 |
| 20 | 0.176 | 50 | 0.681 | 80 | 9.857 |
| 21 | 0.177 | 51 | 0.739 | 81 | 10.784 |
| 22 | 0.176 | 52 | 0.805 | 82 | 11.835 |
| 23 | 0.173 | 53 | 0.879 | 83 | 13.006 |
| 24 | 0.171 | 54 | 0.960 | 84 | 14.270 |
| 25 | 0.167 | 55 | 1.047 | 85 | 15.605 |
| 26 | 0.166 | 56 | 1.138 | 86 | 16.991 |
| 27 | 0.166 | 57 | 1.234 | 87 | 18.421 |
| 28 | 0.166 | 58 | 1.334 | 88 | 19.895 |
| 29 | 0.169 | 59 | 1.444 | 89 | 21.422 |
| 30 | 0.172 | 60 | 1.568 | 90 | 23.024 |
| 31 | 0.178 | 61 | 1.709 | 91 | 24.740 |
| 32 | 0.184 | 62 | 1.871 | 92 | 26.640 |
| 33 | 0.193 | 63 | 2.055 | 93 | 28.901 |
| 34 | 0.202 | 64 | 2.259 | 94 | 31.905 |
| 35 | 0.214 | 65 | 2.478 | 95 | 36.370 |
| 36 | 0.229 | 66 | 2.711 | 96 | 43.668 |
| 37 | 0.246 | 67 | 2.956 | 97 | 56.256 |
| 38 | 0.265 | 68 | 3.217 | 98 | 77.589 |
| 39 | 0.287 | 69 | 3.507 | 99 | 83.333 |

Minnesota Life 14
Ed. F. 61213 6-2004

## TABLE B

### MINNESOTA LIFE INSURANCE COMPANY

**Minimum Death Benefit as a Percentage of Account Value
on a Nicotine-Distinct Basis**

| Attained Age | Minimum Death Benefit | | Attained Age | Minimum Death Benefit | | Attained Age | Minimum Death Benefit | |
|---|---|---|---|---|---|---|---|---|
| | Non-Nicotine | Nicotine | | Non-Nicotine | Nicotine | | Non-Nicotine | Nicotine |
| 10 | 962% | 796% | 40 | 366% | 306% | 70 | 153% | 143% |
| 11 | 931% | 769% | 41 | 354% | 297% | 71 | 149% | 141% |
| 12 | 901% | 744% | 42 | 342% | 288% | 72 | 146% | 138% |
| 13 | 872% | 719% | 43 | 331% | 279% | 73 | 143% | 136% |
| 14 | 845% | 696% | 44 | 321% | 271% | 74 | 140% | 134% |
| 15 | 819% | 673% | 45 | 310% | 263% | 75 | 138% | 132% |
| 16 | 795% | 653% | 46 | 301% | 255% | 76 | 135% | 130% |
| 17 | 771% | 634% | 47 | 291% | 248% | 77 | 133% | 128% |
| 18 | 748% | 615% | 48 | 282% | 241% | 78 | 131% | 127% |
| 19 | 726% | 598% | 49 | 273% | 234% | 79 | 129% | 125% |
| 20 | 705% | 580% | 50 | 265% | 227% | 80 | 127% | 123% |
| 21 | 684% | 563% | 51 | 256% | 221% | 81 | 125% | 122% |
| 22 | 663% | 547% | 52 | 249% | 215% | 82 | 123% | 121% |
| 23 | 643% | 530% | 53 | 241% | 210% | 83 | 121% | 119% |
| 24 | 623% | 514% | 54 | 234% | 204% | 84 | 120% | 118% |
| 25 | 604% | 498% | 55 | 227% | 199% | 85 | 118% | 117% |
| 26 | 584% | 483% | 56 | 220% | 194% | 86 | 117% | 116% |
| 27 | 566% | 468% | 57 | 214% | 189% | 87 | 116% | 115% |
| 28 | 547% | 453% | 58 | 208% | 185% | 88 | 115% | 114% |
| 29 | 529% | 438% | 59 | 202% | 180% | 89 | 114% | 113% |
| 30 | 512% | 424% | 60 | 196% | 176% | 90 | 113% | 112% |
| 31 | 495% | 410% | 61 | 191% | 172% | 91 | 112% | 111% |
| 32 | 479% | 397% | 62 | 186% | 168% | 92 | 111% | 110% |
| 33 | 463% | 384% | 63 | 181% | 164% | 93 | 109% | 109% |
| 34 | 447% | 372% | 64 | 176% | 161% | 94 | 108% | 108% |
| 35 | 433% | 360% | 65 | 172% | 158% | 95 | 107% | 107% |
| 36 | 418% | 348% | 66 | 168% | 154% | 96 | 106% | 106% |
| 37 | 404% | 337% | 67 | 164% | 151% | 97 | 104% | 104% |
| 38 | 391% | 326% | 68 | 160% | 149% | 98 | 103% | 103% |
| 39 | 378% | 316% | 69 | 156% | 146% | 99 | 102% | 102% |

Minnesota Life 15
Ed. F. 61213 6-2004

**TABLE B**

**MINNESOTA LIFE INSURANCE COMPANY**

**Minimum Death Benefit as a Percentage of Account Value
on a Uni-Nicotine Basis**

| Attained Age | Minimum Death Benefit Uni-Nicotine | Attained Age | Minimum Death Benefit Uni-Nicotine | Attained Age | Minimum Death Benefit Uni-Nicotine |
|---|---|---|---|---|---|
| 10 | 896% | 40 | 343% | 70 | 150% |
| 11 | 866% | 41 | 332% | 71 | 147% |
| 12 | 838% | 42 | 322% | 72 | 144% |
| 13 | 811% | 43 | 312% | 73 | 142% |
| 14 | 785% | 44 | 302% | 74 | 139% |
| 15 | 761% | 45 | 293% | 75 | 137% |
| 16 | 737% | 46 | 284% | 76 | 134% |
| 17 | 715% | 47 | 275% | 77 | 132% |
| 18 | 694% | 48 | 267% | 78 | 130% |
| 19 | 674% | 49 | 259% | 79 | 128% |
| 20 | 654% | 50 | 252% | 80 | 126% |
| 21 | 635% | 51 | 244% | 81 | 124% |
| 22 | 616% | 52 | 237% | 82 | 123% |
| 23 | 597% | 53 | 231% | 83 | 121% |
| 24 | 579% | 54 | 224% | 84 | 120% |
| 25 | 561% | 55 | 218% | 85 | 118% |
| 26 | 543% | 56 | 212% | 86 | 117% |
| 27 | 526% | 57 | 206% | 87 | 116% |
| 28 | 509% | 58 | 201% | 88 | 115% |
| 29 | 493% | 59 | 196% | 89 | 114% |
| 30 | 477% | 60 | 191% | 90 | 113% |
| 31 | 461% | 61 | 186% | 91 | 112% |
| 32 | 446% | 62 | 181% | 92 | 111% |
| 33 | 432% | 63 | 177% | 93 | 109% |
| 34 | 418% | 64 | 172% | 94 | 108% |
| 35 | 404% | 65 | 168% | 95 | 107% |
| 36 | 391% | 66 | 164% | 96 | 106% |
| 37 | 378% | 67 | 161% | 97 | 104% |
| 38 | 366% | 68 | 157% | 98 | 103% |
| 39 | 354% | 69 | 154% | 99 | 102% |

**TABLE C**

**MINNESOTA LIFE INSURANCE COMPANY**

**Guaranteed Factors**
**Paid-up Whole-life Policy**

| Attained Age | Factor | Attained Age | Factor | Attained Age | Factor |
|---|---|---|---|---|---|
| 10 | 8.841 | 40 | 3.445 | 70 | 1.482 |
| 11 | 8.560 | 41 | 3.335 | 71 | 1.452 |
| 12 | 8.290 | 42 | 3.230 | 72 | 1.423 |
| 13 | 8.032 | 43 | 3.128 | 73 | 1.396 |
| 14 | 7.788 | 44 | 3.029 | 74 | 1.370 |
| 15 | 7.558 | 45 | 2.935 | 75 | 1.346 |
| 16 | 7.339 | 46 | 2.844 | 76 | 1.324 |
| 17 | 7.129 | 47 | 2.756 | 77 | 1.303 |
| 18 | 6.926 | 48 | 2.672 | 78 | 1.283 |
| 19 | 6.730 | 49 | 2.591 | 79 | 1.265 |
| 20 | 6.538 | 50 | 2.512 | 80 | 1.247 |
| 21 | 6.350 | 51 | 2.437 | 81 | 1.230 |
| 22 | 6.165 | 52 | 2.365 | 82 | 1.215 |
| 23 | 5.983 | 53 | 2.296 | 83 | 1.200 |
| 24 | 5.803 | 54 | 2.229 | 84 | 1.187 |
| 25 | 5.626 | 55 | 2.165 | 85 | 1.174 |
| 26 | 5.452 | 56 | 2.104 | 86 | 1.163 |
| 27 | 5.281 | 57 | 2.046 | 87 | 1.153 |
| 28 | 5.114 | 58 | 1.990 | 88 | 1.143 |
| 29 | 4.950 | 59 | 1.936 | 89 | 1.134 |
| 30 | 4.791 | 60 | 1.884 | 90 | 1.125 |
| 31 | 4.636 | 61 | 1.835 | 91 | 1.116 |
| 32 | 4.486 | 62 | 1.788 | 92 | 1.107 |
| 33 | 4.340 | 63 | 1.742 | 93 | 1.098 |
| 34 | 4.198 | 64 | 1.700 | 94 | 1.088 |
| 35 | 4.062 | 65 | 1.659 | 95 | 1.078 |
| 36 | 3.929 | 66 | 1.620 | 96 | 1.066 |
| 37 | 3.802 | 67 | 1.583 | 97 | 1.054 |
| 38 | 3.678 | 68 | 1.548 | 98 | 1.043 |
| 39 | 3.560 | 69 | 1.514 | 99 | 1.040 |

**MINNESOTA LIFE**

ACCELERATED BENEFITS
GUL POLICY RIDER

Minnesota Life Insurance Company  •  400 Robert Street North  •  St. Paul, Minnesota 55101-2098

BENEFITS RECEIVED UNDER THIS RIDER MAY BE
TAXABLE. A PRIMARY INSURED SHOULD SEEK
ASSISTANCE FROM A PERSONAL TAX ADVISOR
PRIOR TO REQUESTING AN ACCELERATED
PAYMENT OF THE DEATH BENEFIT.

## General Information

This rider amends the group policy to which it is attached
and is subject to every term, condition, exclusion,
limitation, and provision of the group policy unless
otherwise expressly provided for herein.

**What does this rider provide?**

This rider provides for the accelerated payment of either
the full or a partial amount of an insured's death benefit if
the insured has a terminal condition as defined in this
rider.

**What is a terminal condition?**

A terminal condition is a condition caused by sickness or
accident which directly results in a life expectancy of 24
months or less. We must be given medical evidence that
satisfies us that the insured has a terminal condition. That
evidence must include certification by a licensed
physician. For purposes of this rider, a licensed physician
is an individual who is licensed to practice medicine or
treat illness in the state in which treatment is received.
The physician cannot be the primary insured or the
primary insured's spouse, children, parents, grandparents,
grandchildren, brothers or sisters, or the spouse of any
such individuals.

## Accelerated Benefit

**What is the accelerated benefit?**

The accelerated benefit is the amount of the death benefit
payable under this rider. It is the death benefit that is
being accelerated.

**Who may request an accelerated benefit?**

A primary insured may request an accelerated payment of
the insurance on his or her life.

**When can an accelerated benefit be requested?**

An accelerated benefit can be requested any time,
provided the following conditions are met:

(1) the insurance is in force and all premiums due are
fully paid; and
(2) the primary insured is the sole owner of the
certificate; and

(3) we receive a signed authorization to pay an
accelerated benefit from all assignees and
irrevocable beneficiaries; and
(4) application is made in writing or through any other
method made available by us under the group
policy and in a form which is satisfactory to us.

**Is there a minimum death benefit that can be
accelerated?**

Yes. The minimum death benefit that can be accelerated
is $10,000.

**Is there a maximum death benefit that can be
accelerated?**

Yes. The maximum death benefit that can be accelerated
is $1,000,000.

**Is a partial accelerated benefit available?**

Yes. The primary insured may choose to accelerate only
a portion of the death benefit, provided the remaining
amount is at least $25,000. This is called a partial
accelerated benefit.

The primary insured may apply for a subsequent
accelerated benefit at any time. However, the total
amount of the death benefit for all accelerated benefit
payments for an insured cannot exceed $1,000,000. We
may ask for further satisfactory evidence that the insured
meets all requirements for the accelerated benefit.

**What is the effect of an accelerated benefit?**

If the full amount of the death benefit for an insured is
accelerated, the insurance for that insured and all other
benefits under the certificate and any certificate
supplements which apply to that insured will end. If the
insured is a primary insured, the certificate terminates and
any dependents insured by certificate supplement to the
certificate will be allowed to convert such insurance to a
policy of individual life insurance according to the
conversion provisions of the group policy.

If a partial amount of the death benefit for an insured is
accelerated, insurance will remain in force, and the death
benefit will be reduced by the amount of the death benefit
that was accelerated. As a result, the following are
reduced in the same proportion as the reduction in the
death benefit if the insurance being accelerated is
insurance on the life of a primary insured:

(1) the face amount of insurance; and
(2) the net cash value; and
(3) the loan principal.

Minnesota Life 1
Ed. F. 61215 6-2004

The cost of insurance for a primary insured is reduced as a result of the reduction in the face amount of insurance.

If there is any death benefit remaining after the payment of a partial accelerated death benefit, any accidental death and dismemberment insurance covering the insured on whose life the partial accelerated death benefit payment has been made, shall remain unaffected by any such partial accelerated death benefit payment.

**How will we pay the accelerated benefit?**

We will pay the accelerated benefit in one lump sum or in any other mutually agreeable manner.

**To whom will we pay the accelerated benefit?**

We will pay the accelerated benefit to the primary insured who requested the accelerated payment unless the primary insured validly assigns it.

## Termination

**When does coverage on an insured under this rider terminate?**

Coverage on an insured terminates on the earlier of:

(1) the date the insured is no longer insured under the group policy; or
(2) the date this rider terminates.

**When does this rider terminate?**

This rider will terminate on the earlier of:

(1) the date specified in a request from you to terminate this rider; or
(2) the date the group policy is terminated.

## Additional Information

**Is the request for an accelerated benefit voluntary?**

Yes. An accelerated benefit will be made available on a voluntary basis only. An accelerated benefit under this rider is not intended to cause an involuntary reduction of the death benefit ultimately payable to the beneficiary. Therefore, an accelerated benefit is not available if the insured:

(1) is required by law to use this option to meet the claims of creditors, whether in bankruptcy or otherwise; or
(2) is required by a government agency to use this option in order to apply for, obtain, or keep a government benefit or entitlement.

**Do we have the right to obtain independent medical verification?**

Yes. We retain the right to have the insured medically examined at our expense to verify the insured's medical condition. We may do this as often as reasonably required while an accelerated benefit is being considered or paid.

_Dennis E. Prochnicky_                     _Robert L. Senkler_
Secretary                                   President

Policy #50173-G

# KATTEN MUCHIN ZAVIS ROSENMAN
## Group Universal Life Enrollment Form

*Underwritten by Minnesota Life*

1. Verify (make any corrections needed)

   Name of Insured: _Mark Laverman_   Date of Birth: _8/25/67_
   Home Address: _4906 N. Hamlin Avenue   Chicago, IL 60625_
   Social Security Number: _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_   Coverage Amount: _4,210,000_

2. Confirm Ownership (if applicable)

   Owner Name (print): _Mark E. Laverman_
   _Mark F. Laverman_

   Owner Address: _4906 N. Hamlin Ave. Chicago, IL 60625_

   *I confirm the ownership of the insurance certificate on the life of the insured named above. I understand that the absolute owner of the contract will be entitled to every right, privilege or benefit of the certificate.*

   Owner Signature: _Mark E. Laf_   Owner Tax ID: _N/A_

3. Select Beneficiary (if owner of the coverage)

| Name | Relationship | Share% | Social Security # (if available) |
|------|-------------|--------|-------------------------------|
| ~~Kimberly Laverman~~ | ~~Wife~~ | ~~100~~ | 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 |

| Name | Contingent Beneficiary (ies) | | |
|------|-------------|--------|-------------------------------|
| | Relationship | Share% | Social Security # (if available) |
| Roger Laverman | Father | 100 | 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 |

Insured's Signature: _Mark E. Laf_   Date: _5-18-04_
Owner's Signature: _Mark E. Laf_   Date: _5-18-04_

RETURN COMPLETED FORM BY TO: Jim Berge, KMZR, Chicago Office

0000459865

EXHIBIT
B

#16900

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - DOMESTIC RELATIONS DIVISION

IN RE: THE MARRIAGE OF                )
                                      )
KIMBERLY S. LAUGHMAN,                 )
                                      )
                          Petitioner, )
                                      )   Case No. 06 D 446
        v.                            )
MARK E. LAUGHMAN,                     )
                                      )
                          Respondent. )

## JUDGMENT FOR DISSOLUTION OF MARRIAGE

THIS CASE now coming on to be heard upon the Petition for Dissolution of Marriage of the Petitioner, KIMBERLY S. LAUGHMAN, (hereinafter referred to as Petitioner or Wife), and the stipulation of the parties hereto by their respective attorneys that the above-entitled case may come on for immediate hearing upon said Petition for Dissolution; and the Petitioner appearing in open court by ATTILIO V. FIUMETTO, her attorney; and the Respondent being represented by SCHILLER, DUCANTO and FLECK, by ARNOLD B. STEIN, his attorney; and the court hearing the testimony of the Petitioner and Respondent being duly sworn and examined in open court in support of the allegations and charges contained in the Petition for Dissolution of Marriage and the court considering all of the evidence, and now being fully advised in the premises FINDS:

1.      That the Petitioner has resided in the State of Illinois at the time this action was commenced and that said residency has been maintained for more than ninety (90) days next preceding the filing of the Petition herein and the making of the findings herein.

2.      That the Petitioner and Respondent were lawfully married on the 9th day of November, 1996, and that said marriage was registered in Indiana.

3.      That no children were born or adopted by the parties,  and that the Petitioner is not



now pregnant.

4.    That during the marriage herein, irreconcilable differences have occurred between the parties which has caused an irretrievable break down of the parties marriage.

5.    That the Petitioner and Respondent, on the _3/_ day of _August_, 2006 entered into a written Marital Settlement Agreement providing for settlement of the matters relating to the rights of support and maintenance of the parties from each other and for the settlement of their property and marital rights.  The Agreement has been presented to this Court for its consideration and approval and is in words and figures as follows:

## MARITAL SETTLEMENT AGREEMENT

THIS AGREEMENT made and entered into this _31_ day of _AuGusT_ ,2006, by and between, MARK E. LAUGHMAN, (hereinafter referred to as the "Husband"), of the State of Illinois, and KIMBERLY S. LAUGHMAN, (hereinafter referred to as the "Wife"), of the State of Illinois.

### WITNESETH

WHEREAS, said parties were hereto forth on the 9th day of November, 1996, legally married in the State of Indiana;

WHEREAS, no children were born or adopted by the parties as a result of the marriage, and that the Wife is not now pregnant.

WHEREAS, irreconcilable differences have occurred between the parties which has caused an irretrievable breakdown of the parties marriage.

WHEREAS, the Wife has filed against the Husband an action for Dissolution of Marriage in the Circuit Court of Cook County, Illinois, County Department, Domestic Relations Division, under Docket Number 06 D 446 and said case remains pending and undetermined;

WHEREAS, the Wife has employed and has the benefit of counsel of ATTILIO V. FIUMETTO as her attorney. The Husband has employed and has the benefit of counsel of ARNOLD B. STEIN. The attorney for Wife has drafted this Agreement heretofore entered into between the parties;

WHEREAS, the parties acknowledge that each has made full and complete disclosure to the other of all wealth, property, estate and income owned by each of them. Each party also acknowledges that he or she is conversant with the wealth, property, estate and income of the other

1

and that each has been fully informed of his or her respective rights therein;

WHEREAS, both parties expressly state they have freely and voluntarily entered into this Agreement of their own volition, free of any duress or coercion and with full knowledge of each and every provision contained in this Agreement and the consequences thereof. Each party expressly states that no representation has been made to him or her by the other party or by the other party's attorney other than what is contained in this Agreement, state that they regard it to be fair in all respects and not unconscionable;

WHEREAS, it is specifically understood by Husband and Wife that this Agreement, in its entirety, was negotiated and prepared for their direct benefit and not for the direct benefit of anyone else. It is not intended by either Husband or Wife that any persons be third party beneficiaries of this Agreement now or in the future. Any benefits which may be conferred upon any person arise solely as incidental collateral benefits to the direct benefits conferred upon the parties to this Agreement; and,

WHEREAS, without any collusion as to the pending proceedings, or any other proceedings that may be filed between the parties affecting the marital status of the parties, and in the interest of avoiding protracted litigation, the parties consider it to be to their respective best interests to settle, adjust and compromise between themselves, now and forever, the settlement of the property rights of the parties with respect to both marital and non-marital property, the disposition of all claims, whether arising by virtue of the marriage of the parties hereto or otherwise, which each party hereto ever had, now has or may have in the future against each other, whether arising under the laws of Illinois or any other state or country for or on account of any matters whatever; and all rights, whether arising by virtue of the marriage of the parties hereto or otherwise, which each party hereto

2

ever had, now has or may have in the future or may claim to have, whether arising under the laws

of Illinois or any other state or country, in or to any and all property, real, personal or mixed, tangible

or intangible, marital and non-marital heretofore or hereafter owned or limitation of the foregoing,

all inchoate rights and all rights of homestead, inheritance, descent, distribution, community interest

and surviving spouse's award.

NOW THEREFORE, in consideration of the foregoing and in consideration of the mutual

and several covenants, promises and undertakings herein contained, and for other good and valuable

consideration, the receipt and sufficiency of which are hereby jointly and severally acknowledged,

the parties do hereby freely and voluntarily covenant and agree as follows:

## ARTICLE I

### Rights of Action and Incorporation of Recitals

The foregoing recitals are made a part of this Agreement. This Agreement is not one to

obtain or stimulate a dissolution of marriage or made to induce either of the parties hereto to obtain

or stimulate a Judgment for Dissolution of Marriage. Both parties reserve the right to prosecute any

action for dissolution of marriage which he or she has brought or may hereafter bring and defend any

action which has been or may be commenced by the other party.

## ARTICLE II

### Maintenance

1.     Husband in consideration of the premises of this Agreement, waives and releases any

and all claims that he may have against the Wife for maintenance. Husband acknowledges that

maintenance, formerly known as alimony, is his right to support and is separate and distinguishable

3

from child support, and that by relinquishing his right to maintenance he is forever barred from seeking maintenance from his wife in this or any other court, now and forever.

2.      Husband agrees to pay to the Wife maintenance in the amount of $1,000.00 per month commencing on the first day of the first month following entry of Judgement for Dissolution of Marriage herein and continuing in a like sum on the first day of each month thereafter until the first to occur the following events: the Wife's remarriage, the Wife's death, the Wife's cohabitation with another person on a resident continuing conjugal basis, and the Wife's receipt of Forty Eight Thousand Dollars ($48,000.00)

3.      Pursuant to Section 502(f) of the IMDMA, the aforesaid maintenance payments are non-modifiable in all respects.

4.      The parties acknowledge that the aforesaid maintenance payments shall be in satisfaction of the Husband's legal obligation to support the Wife and pursuant to Sections 71 and 215 of the Internal Revenue Code shall have constitute taxable income of the Wife and be tax deductible for income tax purposes to the Husband.

### ARTICLE III

### Real Property

1.      Husband and Wife represent and warrant that neither has any right, title, claim or interest in or to any real property, vacant land, cemetery plots, beneficial interest in any land trust or other trust and that no party or person is holding any real property on their behalf other than a home located at 4908 North Hamlin, Chicago, Illinois.

2.      The parties agree that Husband shall receive as his sole and exclusive property, free and clear of any interest, right, title or claim by the Wife the marital home commonly referred

to as 4908 North Hamlin, Chicago, Illinois. The Husband shall be solely responsible for and shall pay all debt associated with said home, including but not limited to mortgages, home equity loans, taxes, insurance and repairs, and shall indemnify and hold harmless the Wife on the same.

3.     That as and for consideration of the Husband receiving the marital home as his sole property, the Husband shall pay the Wife $125,000.00 on or before the date of entrance of the parties Judgement for Dissolution of Marriage.

## ARTICLE IV

### Personal Property

1.     Husband and Wife have equally divided all personal property, including furniture and furnishings to their mutual satisfaction. Each party shall have the sole and exclusive right, title and interest in and to that personal property currently in his or her possession, free and clear of any right, title or interest of the other party.

2.     Wife shall receive as her sole property, free and clear of any interest or claim of the Husband, the 2004 Honda. The Husband shall be solely responsible for and shall pay the outstanding auto loan on said vehicle and shall hold harmless and indemnify the Wife on the same. The Husband shall do any and all things reasonably required to transfer any and all interest he may have thereon to the Wife.

3.     Husband shall receive as his sole property, free and clear of any interest or claim of the Wife, the 1969 motorcycle. The Husband shall be solely responsible of all debt associated with said vehicle and shall indemnify and hold harmless the Wife on the same.

## ARTICLE V

### Banking and Retirement Savings Plans

1.      The parties agree that all banking accounts that currently exist in their name shall be  the sole property of the person's name who appears on said accounts and the parties waive any and all interest, right, or claim they may have to the other's account;

2.      HUSBAND and WIFE acknowledge and agree that neither party is currently entitled to a pension and that no such accounts exist.

3.      The WIFE shall receive as her sole and exclusive property, free and clear of any interest, right, title, or claim of the HUSBAND all of her 401(k) saving plan located at Liberty Mutual.

## ARTICLE VI

### Law Practice

1.      The Husband shall receive as his sole property, free and clear of any interest of the Wife all interest in has in the law firm commonly referred to as Katten, Muchin & Rosenmann. The Husband shall be solely responsible and liable for all debt associated with said ownership interest and shall indemnify and hold harmless the Wife on the same including any Federal or State Tax liability.

## ARTICLE VII

### Unknown and Concealed Properties

1.      If there is any property, real, personal or mixed, which is unknown to the parties to this Agreement, is concealed by either party or is otherwise not disposed of by virtue of this

6

Agreement, whether the title to same is held in joint tenancy, tenancy in common or some other form of co-ownership or separate ownership, then, at the written request of either party, after discovery of same, said property shall be sold and the net proceeds received therefrom shall be divided equally between the parties.

## ARTICLE VIII

### Non-Marital Property

1.    Wife shall retain sole and exclusive right, title and interest, free and clear of any right, title or interest of Husband, in and to her non-marital property, including, but not limited to, clothing, jewelry and memorabilia.

2.    Husband shall retain sole and exclusive right, title and interest, free and clear of any right, title or interest of Wife, in and to his non-marital property, including, but not limited to, clothing, jewelry and memorabilia.

## ARTICLE IX

### Debts and Obligations

1.    Each party agrees to be solely responsible for any and all credit debt that was created in their name since their date of marriage and to indemnify and hold harmless the other party for said debt.  In addition the Husband agrees to be solely liable and to pay the outstanding loan through the Wife's Thrift Incentive Plan at Liberty Mutual in the approximate amount of $1,849.79.

2. Each party agrees with the other party that he or she will not at any time hereafter contract any debt or liability whatsoever with third parties for which the other, or his or her legal heirs, representatives or assigns, or his or her property or estate shall become liable.  Each party

7

agrees with the other party at all times to keep the other party, his or her heirs, indemnified of and from any claims, debts, charges or liabilities hereafter contracted by himself and herself with any third parties.

3. Without limiting in any manner the parties undertakings hereunder, if upon this Agreement becoming effective, Husband or Wife fails to pay any obligation assumed by him or by her, or as set forth in this Agreement, the nondefaulting party shall have the right to make any payments in connection therewith and the defaulting party shall reimburse the nondefaulting party for such expenditures and shall likewise be liable for and shall pay all costs, expenses and reasonable attorney's fees arising as an incident of his or her default and for which the nondefaulting party becomes obligated, including those obligations hereunder. The nondefaulting party shall have the right to pursue enforcement of the obligations undertaken by the defaulting party by whatever remedy or remedies are legally available to him or to her.

4.      Each party shall hold the other free, harmless and indemnified on all obligations they assume.

## ARTICLE X

### Tax Returns

1.      The Husband and Wife shall execute and file joint federal and sate income tax returns for the year 2005. Regarding these the Husband and Wife agrees as follows:

a.   The Husband represents and warrants to the Wife that he accurately reported all income and deductions and has paid all income taxes, state and federal, regarding his income and deductions on the joint tax returns heretofore filed by the parties; and in the event there is subsequently found to be taxes, penalties or interest due and owing with respect to his income or

deductions, he will pay and indemnify the Wife therefrom any liability thereon.

b.  The Wife represents and warrants to the Husband that she has accurately reported all income and deductions and has paid all income taxes, state and federal, regarding her income and deductions on the joint tax returns heretofore filed by the parties; and in the event there is subsequently found to be taxes, penalties or interest due and owing with respect to her income or deductions, she will pay and indemnify the Husband therefrom any liability thereon.

c.  If there is a deficiency assessment in connection with any of the aforesaid joint returns heretofore or hereafter, the party receiving the deficiency notice shall notify the other party immediately in writing.  The party whose income or deduction were inaccurate shall pay the amount ultimately determined to be due thereon, together with interest and penalties, and any and all expenses that may be incurred if that party decides to contest the assessment.


## ARTICLE XI

### Attorney's Fees

1.  The Husband shall be individually liable for and shall pay all attorney's fees and costs he incurred on his behalf in the instant proceeding.

2.  The Wife shall be individually liable for and shall pay all attorney's fees and costs she incurred on her behalf in the instant proceeding.

3.  In the event Husband or Wife willfully or unreasonable fails or refuses to duly perform his or her financial and other undertakings as set forth in this Agreement, and as a result the aggrieved party incurs any expenses, including, but not limited to, attorney's fees to enforce the terms and provisions of this Agreement, the party so failing to perform his or her obligations

shall indemnify and hold the other harmless in connection with any costs and expenses, even though the aggrieved party, at the time, has the ability to pay his or her own expenses and costs.

## ARTICLE XII

### General Provisions

1.    <u>Execution of Documents</u>.  Except as otherwise provided, each of the parties hereto shall execute, acknowledge, and deliver, upon the effective date of this Agreement, good and sufficient instruments necessary and proper to vest the titles and estates in the respective parties hereto, as herein above provided, and thereafter, at any time and from time to time, to execute, acknowledge and deliver any and all documents which may be necessary or proper to carry out the purposes of this Agreement and establish of record the sole and separate ownership of the several properties of said parties in the manner herein agreed and provided.  If either party hereto for any reason shall fail or refuse to execute any such documents, then this Agreement shall, and it is hereby expressly declared to, constitute a full and present transfer, assignment and conveyance of all rights herein above designated to be transferred, assigned and conveyed, and a full, present and effective relinquishment and waiver of all rights herein above designated to be relinquished and waived.  To further implement the execution and delivery of any and all documents required for the transfer of real estate hereunder, the parties designate any judge or associate judge of the Circuit Court of Cook County, Illinois, Land Title Division, to execute and deliver any and all such documents in the place and stead of the party hereto so obligate.

2.    <u>Mutual Release</u>.  To the fullest extent by law permitted to do so, and except as herein otherwise provided, each of the parties does hereby forever relinquish, release, waive and

forever Quit Claim and grant to the other, his or her heirs, personal representatives and assigns, all rights of maintenance, alimony, dower, inheritance, descent, distribution, community interest and all other right, title, claim, interest and estate as husband and wife, widow or widower or otherwise, by reason of the marital relationship existing between the hereto, under any present or future law, of which he or she otherwise has or might assert of the other, real, personal, or mixed, or his or her estate whether now owned or hereafter in any manner acquired by the other party, or whether in possession or in expectancy, and whether vested or contingent and each party further covenants and agrees for himself or herself, his or her heirs, personal representatives and assigns, that neither of them will at any time hereafter sue the other, or his or her heirs, personal representatives and assigns, for the purpose of enforcing any or all of the rights relinquished under this Agreement; and each of the parties agree that in the event any suit shall be commenced, this release, when pleaded, shall be and constitute a complete defense to any such claim or suit so instituted by either party hereto; and such of the parties further agrees to execute, acknowledge, and deliver at the request of the other party, his or her heirs, personal representatives, grantees, devises, or assigns, any or all such deeds, releases or other instruments and further assurances as may be required or reasonable required to effect or evidence such release, waiver, relinquishment or extinguishment of such rights; provided, however, that nothing herein contained shall operate or be construed as a waiver or release by either party to the other of the obligation on the part of the other to comply with the provisions of this Agreement, or the rights of either party under this Agreement.

3.   <u>Waiver of Estate Claim</u>.  Except as herein otherwise provided, each of the parties hereto hereby waives and relinquishes all rights to act as administrator or administrator with the

will annexed of the estate of the other party, and each of the parties hereto does further relinquish all right to inherit by intestate succession any of the property of which the other party may die seized or possessed, and should either of the parties hereto die intestate, this Agreement shall operate as a relinquishment of all rights of the surviving party hereafter to apply for letters of administration in any form, and the estate of such deceased party, if he or she dies intestate, shall descend to the heirs at law of such deceased party, in the same manner as though the parties hereto respectively, reserving the right to dispose, by testament or otherwise, of his or her respective property in any way that he or she may see fit, without any restriction or limitation whatsoever. Nothing herein contained is intended or shall operate, constitute or be construed as a waiver or release by either party of the obligation of the other to comply with the terms of this Agreement, or the rights of either party under this Agreement.

    4.    <u>Wavier of rights to proceeds on insurance policies</u>. Each of the parties hereby releases and/or waives any interest, beneficial or otherwise, which he of she may have acquired in or to life insurance policies owned by the other.

    5.    <u>Modification of Agreement by Court Prior to Entry of Judgment</u>. In the event any court alters, changes or modifies any portion of this Agreement at any time prior to the entry of Judgment for Dissolution of Marriage, then any pending proceeding before such court shall be suspended so that Husband or Wife shall have the opportunity to consider said alteration, change or modification by said court and, if necessary, renegotiate all or any part of this Agreement. In any event, if any court alters, changes or modifies any portion of this Agreement at any time prior to the entry of a Judgment for Dissolution of Marriage, then the entire Agreement shall become voidable at the option of Husband and Wife.

6.    Incorporation of Agreement into Judgment of Dissolution of Marriage and Effective Date of Agreement. In the event the parties at any time hereafter obtain a dissolution of marriage in the case presently pending between them, this Agreement and all of its provisions shall be incorporated into any such judgment for dissolution of marriage, either directly or indirectly or by reference, and upon entry of said Judgment, this Agreement shall not become effective or of any validity unless a Judgment for Dissolution of Marriage shall retain the right to enforce the provisions and terms of the Agreement, which Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, assigns, devisees and grantees of the parties hereto.

7.    Construction, Enforcement or Modification of Agreement by Court after Entry of Judgment. This Agreement shall be construed in accordance with the laws of the State of Illinois, entirely independent of the forum and political jurisdiction where it may come up for construction, enforcement or modification. If a court of competent jurisdiction at any time after entry of Judgment of Dissolution of Marriage holds that a portion of this Agreement is invalid, the remainder shall not be affected thereby and shall continue in full force and effect.

IN WITNESS WHEREOF, the Husband and Wife have hereunto set their respective hands and seals the day and year first above written.


_____        _____
MARK E. LAUGHMAN                        KIMBERLY S. LAUGHMAN

AND THE COURT HAVING CONSIDERED THE AGREEMENT AND THE

CIRCUMSTANCES OF THE PARTIES FINDS THE AGREEMENT IS NOT

UNCONSCIONABLE AND THAT THE PARTIES ASSERT THAT THE AGREEMENT WAS

FREELY AND VOLUNTARILY ENTERED INTO BY THEM IS FAIR AND EQUITABLE IN

ITS TERMS AND PROVISIONS, AND SHOULD BE APPROVED BY THE COURT.

6.    That the Petitioner has established by competent, material and relevant evidence all

of the allegations and charges contained in her Petition for Dissolution of Marriage and the

equities of the case are with the Petitioner.

7.    That this Court has jurisdiction over the parties of this case and the subject matter

thereof.

IT IS THEREFORE ORDERED AND ADJUDGED AND THIS COURT BY VIRTUE

OF THE POWER AND AUTHORITY THEREIN VESTED, AND THE STATUTE IN SUCH

CASE MADE AND PROVIDED, DOTH ORDERED, ADJUDGED AND DECREED AS

FOLLOWS:

A.    That the bonds of matrimony existing between the Petitioner, KIMBERLY S.

LAUGHMAN, and the Respondent, MARK E. LAUGHMAN, be and the same are hereby

dissolved.

B.    That the Marital Settlement Agreement herein above contained is hereby in all

respects approved, confirmed, ratified and adopted as the judgment of this court to the same

extent and with the same force and effect as if the provisions contained in said Agreement were

set forth in this paragraph of this Judgment and each and every provision thereof is binding upon

each of the parties hereto and each of the parties shall do and perform all of the acts undertaken

and carry out all of the provisions contained in the aforesaid Agreement which is made part of this

Judgment.

C.     That the Respondent is  forever barred from seeking maintenance from the

Petitioner now and forever, in this or any other Court.  The Respondent shall pay the Petitioner

maintenance as outlined in Article II of the parties Marital Settlement Agreement.

D.     That the Petitioner and Respondent shall carry out all of the terms, provisions and

conditions of this Judgment and each of the parties shall execute, acknowledge and deliver good

and sufficient instruments necessary or proper to vest that titles and estates in the respective

parties hereto as provided in the Marital Settlement Agreement herein above contained and

hereafter at any time and from time to time to execute, acknowledge and deliver any and all

documents which may be necessary or proper to carry out the purpose of said Agreement and

establish of record the sole and separate ownership of the several property of said parties in the

manner therein agreed and provided.

E.     That the Petitioner has the right to resume the use of her maiden name,

KIMBERLY FINGER if she so desires.

F.     That this Court reserves jurisdiction of the subject matter of this case and the

parties hereto for the purpose of enforcing the terms of this Judgment and the terms and

provisions of the Agreement herein above contained.

ENTER:

> ENTERED
> JUDGE LISA MURPHY-1654
>
> SEP 0 6 2006
>
> DOROTHY BROWN
> CLERK OF THE CIRCUIT COURT
> OF COOK COUNTY, IL
> DEPUTY CLERK

ATTILIO V. FIUMETTO
ATTORNEY AT LAW
218 NORTH JEFFERSON/SUITE 400
CHICAGO, IL 60661
(312) 831-2111
Atty # 16900

# CITY OF CHICAGO
## DEPARTMENT OF PUBLIC HEALTH

STATE OF ILLINOIS
COUNTY OF COOK
CITY OF CHICAGO

NOV 0 2 2007

I, TERRY MASON M.D., LOCAL
REGISTRAR OF VITAL STATISTICS OF
THE CITY OF CHICAGO, DO HEREBY
CERTIFY THAT I AM THE KEEPER OF
THE RECORDS OF BIRTHS, STILLBIRTHS
AND DEATHS FOR THE CITY OF CHICAGO
BY VIRTUE OF THE LAWS OF THE STATE
OF ILLINOIS AND THE ORDINANCES OF
THE CITY OF CHICAGO; THAT THE
ACCOMPANYING CERTIFICATE ON THIS
SHEET IS A TRUE COPY OF A RECORD
KEPT BY ME IN ORDINANCE OF SAID
LAW AND ORDINANCES.

Terry Mason MD
LOCAL REGISTRAR

THIS CERTIFICATE COPY VALID WHEN
MULTICOLOR SIGNATURE SEAL IS
AFFIXED.

---

DISTRICT NO. 16.10

REGISTERED NUMBER  614506

## MEDICAL CERTIFICATE OF DEATH

1. DECEASED—NAME FIRST: Mark  MIDDLE: Edward  LAST: Laughman

2. SEX: Male

DATE OF DEATH: Oct. 28 2007

3. AGE—LAST BIRTHDAY: 40

DATE OF BIRTH: August 25, 1967

4. COUNTY OF DEATH: Cook

HOSPITAL OR OTHER INSTITUTION—NAME: Rush University Medical Center

IF HOSP. OR INST. INDICATE D.O.A., OP/EMER., INPATIENT: Inpatient

6a. CITY, TOWN, TWP, OR ROAD DISTRICT NUMBER: Chicago

MARRIED, NEVER MARRIED, WIDOWED, DIVORCED (SPECIFY): Divorced

6b. BIRTHPLACE (CITY AND STATE OR FOREIGN COUNTRY): South Bend, IN

10. SOCIAL SECURITY NUMBER: 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

USUAL OCCUPATION: Attorney

KIND OF BUSINESS OR INDUSTRY: Legal

13a. RESIDENCE—STATE: Illinois  ZIP CODE: 60625

13b. COUNTY: Cook

CITY, TOWN, TWP, OR ROAD DISTRICT NO.: Chicago

INSIDE CITY: Yes

RESIDENCE: 3988 N. Hamlin

RACE—WHITE, BLACK, AMERICAN INDIAN, ETC.: White

NAME OF SURVIVING SPOUSE:

16. MOTHER—NAME FIRST: Ann  MIDDLE: Elizabeth  LAST: Boykin

RELATIONSHIP: Sister

MAILING ADDRESS: 902 Wilson Blvd. Mishawaka, IN 46545

15. FATHER—NAME FIRST: Douglas  MIDDLE: Allen  LAST: Laughman

INFORMANT'S NAME: Gretchen Laughman

18. PART I.

IMMEDIATE CAUSE (Final disease or condition resulting in death): (a) Acute liver failure

DUE TO, OR AS A CONSEQUENCE OF: (b) Hepatorenal Syndrome

PART II. Other significant conditions contributing to death but not resulting in the underlying cause given in PART I.

AUTOPSY (YES/NO): No

WAS CORONER OR MEDICAL EXAMINER NOTIFIED: No

HOUR OF DEATH: 9:16 A

20a. DATE OF OPERATION, IF ANY: October 27, 2007

22a. SIGNATURE: Mark Yadav MD

22b. NAME AND ADDRESS OF CERTIFIER: Mark Yadav, MD 1653 W. Congress Pkwy Chg 606 Il

DATE SIGNED: October 28, 2007

ILLINOIS LICENSE NUMBER: 036102363

21. BURIAL, CREMATION, REMOVAL, ETC.: Cremation

24a. CEMETERY OR CREMATORY—NAME: Heights Crematory

LOCATION CITY OR TOWN: Chicago Heights, IL

STREET AND NUMBER OR R.F.D.: P.O. Box 41

22c. FUNERAL HOME: Hines

23. NAME AND ADDRESS OF FUNERAL SERVICE: Veterans Funeral Service (David C. Pinn)

STATE: Illinois

FUNERAL DIRECTOR'S ILLINOIS LICENSE NUMBER: 034-015042

DATE: NOVEMBER 2, 2007

DATE: NOV 1 2007

28a. FUNERAL DIRECTOR'S SIGNATURE

25b. LOCAL REGISTRAR'S SIGNATURE: Terry Mason MD

VERSION (Rev. 5/94)

EXHIBIT D

## Beneficiary Statement

**Minnesota Life Insurance Company, a Securian Financial Group affiliate**
Group Division Claims • P. O. Box 64114 • St. Paul, MN 55164-0114

For claim information call:
Toll free 1-888-658-0193
Fax 651-665-7106

**MINNESOTA LIFE**

Name of deceased (last, first, middle initial)
*LAUGHMAN  MARK  E.*

Policy number

CLAIM NUMBER *763-185*

Other names by which the deceased has been known, if any

Address prior to death (street, city, state, zip)
*4908 North Hamlin Ave. Chicago, IL. 60625-6004*

| Date of birth (mo/day/yr) | Date of death (mo/day/yr) | Date last worked (mo/day/yr) |
|---|---|---|
| *8/25/67* | *10/28/07* | *8/21/07* |

Name of beneficiary (last, first, middle initial)
*LAUGHMAN  DOUGLAS  A.*

| Relationship to deceased | Beneficiary's date of birth |
|---|---|
| *FATHER* | *11/1/45* |

**CERTIFICATION** – Under penalties of perjury, I certify that:
(1) The number shown on this form is my correct Social Security number or Taxpayer Identification number, **and**
(2) I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding, **and**
(3) I am a U. S. person (including a U. S. resident alien).

**CERTIFICATION INSTRUCTIONS:** You must cross out item (2) above if you have been notified by IRS that you are subject to backup withholding because of underreporting interest or dividends on your tax return. However, if after being notified by the IRS that you were subject to backup withholding you received another notification from the IRS that you are no longer subject to backup withholding, do not cross out item (2).

**Certification Notice:**
THE IRS REQUIRES US TO OBTAIN CERTIFICATION OF YOUR SOCIAL SECURITY NUMBER OR TAXPAYER IDENTIFICATION NUMBER. WITHOUT THIS INFORMATION, YOU MAY BE SUBJECT TO GOVERNMENT IMPOSED BACKUP WITHHOLDING FOR ANY INTEREST PAID ON THE DEATH BENEFIT.

| Signature of beneficiary | Date signed | Beneficiary's Social Security number |
|---|---|---|
| X *Douglas A. Laughman* | *12/18/07* | *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* |

Current address of beneficiary (street, city, state, zip)
*902 Wilson Blvd. Mishawaka, IN 46545*

Beneficiary's telephone number
*574-295-3477*

Permanent address of beneficiary (if different than above)

### A CERTIFIED COPY OF THE PUBLIC DEATH RECORD IS REQUIRED AS PROOF OF DEATH

**NOTICE:** Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against the insurer, submits an application or files a claim containing a false or deceptive statement may be guilty of insurance fraud. The commission of insurance fraud may subject such person to criminal and/or civil penalties. Any insurance company or agent of an insurance company who knowingly attempts to defraud a policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Division of Insurance.



EXHIBIT

E

## Beneficiary Statement

**Minnesota Life Insurance Company,** a Securian Financial Group affiliate
Group Division Claims • P.O. Box 64114 • St. Paul, MN  55164-0114

For claim information call:
Toll free 1-888-658-0193
Fax 651-665-7106

**MINNESOTA LIFE**

Name of deceased (last, first, middle initial)  **Laughman  MARK  E**

Policy number  **50173**

CLAIM NUMBER  **763-185**

Other names by which the deceased has been known, if any

Address prior to death (street, city, state, zip)  **4908 N. Hamlin Ave. Chicago, IL 60625**

Date of birth (mo/day/yr)  **08/25/1967**

Date of death (mo/day/yr)  **10/28/2007**

Date last worked (mo/day/yr)  **08/21/2007**

Name of beneficiary (last, first, middle initial)  **Weise (Laughman) Kimberly S.**

Relationship to deceased  **Ex-Spouse**

Beneficiary's date of birth  **07/19/1960**

**CERTIFICATION** – Under penalties of perjury, I certify that:

(1) The number shown on this form is my correct Social Security number or Taxpayer Identification number, **and**

(2) I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding, **and**

(3) I am a U. S. person (including a U. S. resident alien).

**CERTIFICATION INSTRUCTIONS:** You must cross out item (2) above if you have been notified by IRS that you are subject to backup withholding because of underreporting interest or dividends on your tax return. However, if after being notified by the IRS that you were subject to backup withholding you received another notification from the IRS that you are no longer subject to backup withholding, do not cross out item (2).

**Certification Notice:**
THE IRS REQUIRES US TO OBTAIN CERTIFICATION OF YOUR SOCIAL SECURITY NUMBER OR TAXPAYER IDENTIFICATION NUMBER. WITHOUT THIS INFORMATION, YOU MAY BE SUBJECT TO GOVERNMENT IMPOSED BACKUP WITHHOLDING FOR ANY INTEREST PAID ON THE DEATH BENEFIT.

Signature of beneficiary
X **Kimberly S. Weise (Laughman)**

Date signed  **11/16/07**

Beneficiary's Social Security number  **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**

Current address of beneficiary (street, city, state, zip)  **12360 Dunn Rd. Mishawaka, IN 46545**

Beneficiary's telephone number  **574-255-2905**

Permanent address of beneficiary (if different than above)

### A **CERTIFIED** COPY OF THE PUBLIC DEATH RECORD IS REQUIRED AS PROOF OF DEATH

**NOTICE:** Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against the insurer, submits an application or files a claim containing a false or deceptive statement may be guilty of insurance fraud. The commission of insurance fraud may subject such person to criminal and/or civil penalties. Any insurance company or agent of an insurance company who knowingly attempts to defraud a policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Division of Insurance.

F5562-GRP  Rev 2-2007


EXHIBIT
F